**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROBIN L. TOVAR ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11 C 2660 |
| v. ) | |
| ) | Magistrate Judge Michael T. Mason |
| MICHAEL J. ASTRUE, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Robin L. Tovar ("Tovar" or "claimant") has filed a motion for summary judgment [18] seeking reversal or remand of the final decision of the Commissioner of Social Security ("defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), and 1382c(a)(3)(A). The Commissioner asks the Court to uphold the Administrative Law Judge's ("ALJ") decision. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). For the reasons set forth below, the Court grants claimant's motion for summary judgment [18] in part and denies it in part.

**I. BACKGROUND**

**A. Procedural History**

Claimant filed applications for DIB and SSI on January 29, 2007 alleging an onset of disability on January 5, 2007. (R. 120-22, 128-30.) The Social Security Administration denied her claims initially on May 3, 2007, and upon reconsideration on

December 27, 2007. (R. 55-63, 70-78.) Tovar filed a timely request for a hearing on January 22, 2008. (R. 80.) On June 18, 2009, Tovar appeared with counsel before ALJ Kenneth E. Stewart. (R. 22-54.) On August 20, 2009, ALJ Stewart issued a written decision denying Tovar's request for benefits. (R. 13-21.) Tovar filed a timely request for review. (R. 8-9.) On February 25, 2011, the Appeals Council denied her request, making the ALJ's decision the final decision of the Commissioner. (R.1-3); *see Jirau v. Astrue*, 715 F. Supp. 2d 814, 823 (N.D. Ill. 2010). Tovar subsequently filed this timely action in the District Court. Thereafter, the parties consented to this Court's jurisdiction pursuant to 28 U.S.C § 636(c).

### B. Medical Evidence

Claimant seeks DIB and SSI for disabling conditions stemming from a herniated disc, sciatica, congenital spinal stenosis, decreased bladder control, anxiety, and depression. (R. 135.)

#### 1. Treating Physicians

Throughout 2006 and 2007, Tovar sought treatment from Dr. Sarada Alla at the Carpentersville Community Health Center/Aunt Martha's Center, which her attorney at the administrative level described as a "sliding scale medical and psychiatric clinic for the indigent." (R. 221.) At her first appointment, on August 1, 2006, Dr. Alla assessed anxiety and prescribed Paxil and counseling. (R. 276-77.) On October 25, 2006, Tovar complained of lower back pain. (R. 274-75.) She had the same complaint on December 26, 2006. (R. 272-73.)

On December 27, 2006, Tovar sought chiropractic treatment at Turner Pain and Wellness Center ("Turner") for lower back pain, right leg pain, and numbness, beginning

2

six days earlier.  (R. 234.)  The examining chiropractor noted a history of sciatica down the right leg.  (R. 237.)  A musculoskeletal examination revealed mostly normal findings.  (R. 238.)  A supine straight leg raise test was positive on the left at 70 degrees and on the right at 25 degrees.  (*Id.*)  An x-ray of Tovar's anteroposterior and lateral lumbar spine revealed diminished L5-S1 disc space.  (R. 239.)  The chiropractor diagnosed a lumbar sprain, neuralgia, neuritis, radiculitis, displacement of lumbar intervertebral disc, and nonallopathic lesions of the sacral region.  (*Id.*)  He recommended chiropractic manipulation and physical therapy three times per week for three to four weeks.  (*Id.*)  The prognosis was "favorable."  (*Id.*)

Tovar again sought treatment at Turner on December 29, 2006 complaining of continued back pain.  (R. 243-44.)  The examining chiropractor made adjustments, noted a lower back sprain, and commented that an MRI may be needed if Tovar's pain fails to improve.  (R. 244.)  On January 8, 2007, Tovar returned to Turner complaining of back spasm and leg numbness after bending over to empty the dishwasher.  (R. 245.)  The treating chiropractor noted that Tovar "likely has disc injury," but did not deem an MRI necessary as "it will not change therapy plan."  (*Id.*)

On January 9, 2007, instead of returning to Turner, Tovar visited the urgent care center at Sherman Hospital complaining of sharp back pain radiating to her right leg, which was exacerbated by movement.  (R. 254.)  An MRI of the lumbar spine revealed a disc herniation at L5-S1 that was "completely effacing the bony canal and obliterating the thecal sac and the nerve roots at this level."  (R. 260.)  The MRI also revealed "some underlying congenital spinal stenosis throughout the lumber spine."  (*Id.*)  Mild disc bulging was seen at L3-4 and L4-5.  (*Id.*)  The attending physician prescribed

Darvocet, Flexeril, and Naprosyn, and advised Tovar to follow up with her primary care physician in one to two days. (R. 253.)

On January 10, 2007, Tovar followed up with Dr. Alla who referred her to a neurosurgeon at the University of Illinois Medical Center ("Medical Center"). (R. 270-71.) Tovar underwent a neurosurgery consultation on January 16, 2007. (R. 314-15.) She explained that her back pain had become more intense and that she experienced no relief from pain medication. (R. 314.) She also complained of genital pain and leg numbness. (*Id.*) The examining physician assessed a L5-S1 central disc extrusion and admitted Tovar for surgery. (R. 315.) Dr. Manali Barua promptly performed a L5 laminectomy and L5-S1 discectomy. (R. 322-24.) Tovar was discharged on January 17, 2007 with instructions not to return to work. (R. 339.)

On February 20, 2007, Tovar returned to the Medical Center for post-operative follow up. (R. 312-13.) Tovar reported that the numbness in her genital area and the lateral side of her thigh, leg, and foot had improved, however she still had some pain and numbness on her heels bilaterally. (R. 312.) Tovar also complained of headaches, but Dr. Barua did not believe that those headaches could be attributed to a "cerebrospinal fluid leak." (*Id.*) Dr. Barua advised Tovar to try caffeine products to alleviate her headaches and referred her to physical therapy for her pain. (R. 313.) She was advised to return for another MRI if her symptoms did not improve. (*Id.*) As claimant has explained on multiple occasions, she never returned to the Medical Center for an MRI or physical therapy due to a lack of medical insurance. (*See* R. 359, 408.)

Tovar did follow-up with Dr. Alla on February 28, 2007. (R. 268-69.) Tovar returned to see Dr. Alla on June 13, 2007 for a refill of her Paxil prescription. (R. 374-

4

75.) Dr. Alla noted a history of depression and panic attacks and again referred Tovar for counseling. (R. 375.) On July 20, 2007, she returned complaining of headaches and a sore throat. (R. 372-73.)

On September 15, 2008, Tovar began treatment with Dr. J. Hussain, a psychiatrist at Aunt Martha's Center. (R. 444-45.) Tovar explained that she was abused by her stepfather both physically and mentally as a child. (R. 444.) She has been pulling out her hair and experiencing nightmares about her abuse since age twelve. (*Id.*) Tovar left home at age fifteen after her stepfather tried to sexually abuse her. (*Id.*) Dr. Hussain assessed moderate and recurrent depression, post traumatic stress disorder ("PTSD"), and trichotillomania (chronic hair pulling). (R. 445.) She referred Tovar for individual counseling and prescribed Celexa. (*Id.*)

On October 13 and November 13, 2008, Tovar complained of increased anxiety, hair pulling, and nightmares. (R. 442-43.) A month or so later, Tovar complained of pain and requested Xanax, which Dr. Hussain ultimately prescribed. (R. 441.) Tovar returned to see Dr. Hussain on three occasions in 2009 and continued taking Xanax and Celexa for her feelings of anxiety and depression. (R. 449-51.)

### 2. State Agency Consultants

#### a. Physical Assessments

On April 15, 2007, three months post-surgery, Dr. Chansoo Kim completed a Physical Residual Functional Capacity ("RFC") Assessment. (R. 298-305.) Dr. Kim found that Tovar could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds. (R. 299.) Further, Dr. Kim concluded that Tovar could stand and/or walk with normal breaks for about six hours in an eight-hour workday, and

5

could sit with normal breaks for about six hours in an eight-hour workday. (*Id.*) With respect to postural limitations, Dr. Kim found that Tovar could frequently balance, occasionally climb ramps and stairs (but never ladders, ropes or scaffolds), and occasionally stoop, kneel, crouch, and crawl. (R. 300.) He found no manipulative, visual, communicative, or environmental limitations. (R. 300-02.)

On December 11, 2007, Dr. Roopa K. Karri conducted an internal medicine consultative examination. (R. 407-10.) Tovar reported "she has a history of low back pain with two slipped discs and stress incontinence of urine" with coughing and sneezing. (R. 407-08.) Tovar explained that her right leg is numb and her entire right side is stiff. (R. 408.) She also complained of continued back pain on the right side. (*Id.*) She claimed she could do her "daily chores." (*Id.*)

Dr. Karri reported that Tovar could walk fifty feet without support and that she had a normal gait without the use of an assistive device. (R. 409.) Dr. Karri also noted that there was no limitation in the range of motion of any joints except the lumbar spine, which Dr. Karri was unable to check because Tovar said she was unable to bend more than twenty degrees. (*Id.*) Dr. Karri noted tenderness in the lumbar spine and sacroiliac joints on both sides. (*Id.*) A sensory examination revealed a decreased sensation to pinprick in the right lateral leg and the foot. (R. 410.) All other examination results were unremarkable. (R. 409-410.) Dr. Karri recorded his impression as a history of low back pain, with markedly decreased range of motion "on exam today" and a decreased sensation in the right lateral leg, as well as a history of stress incontinence. (R. 410.)

On December 21, 2007, Dr. David Mack completed a second Physical RFC

Assessment. (R. 430-37.) Dr. Mack found that Tovar could occasionally lift and/or carry twenty pounds, frequently ten pounds, and could stand, walk, and sit for six hours in an eight-hour day. (R. 431.) Regarding postural limitations, Dr. Mack concluded that Tovar is "limited only [to occasional] stopping and crouching; there would be no other limits in this domain." (R. 432.) He found no manipulative, visual, communicative, or environmental limitations. (R. 432-34.) Dr. Mack further noted that Tovar "still has ROM loss in the low back w[ith] minimal sensory changes in the [right] leg," but has full ROM of all other axial and spinal joints. (R. 437.) Ultimately, Dr. Mack concluded that Tovar can still perform work-related actions. (*Id.*)

### b. Mental Assessments

On October 16, 2007, Dr. Barbara Sherman, a licensed clinical psychologist, performed a mental status examination. (R. 358-63.) Dr. Sherman reported that Tovar was a neat-looking woman with somewhat disheveled hair. (R. 360.) Tovar described her history of back pain and surgery, and reported that she still experiences blurriness of vision and severe headaches. (R. 359.) Tovar explained that she has difficulty showering, caring for her dogs, and walking due to the pain and numbness in her feet. (R. 360.) She does only light cooking and does not do laundry. (*Id.*) Tovar also reported her history of abuse at the hands of her stepfather. (R. 359.)

Dr. Sherman assessed panic disorder without agoraphobia and PTSD. (R. 362.) She found no signs of psychosis and noted that Tovar's speech was clear and coherent. (*Id.*) She commented on Tovar's extensive trauma history, which has led to flashbacks, hyper-vigilance, and nightmares. (*Id.*) Cognitive screening showed adequacy of functioning, although Tovar's common sense reasoning and judgment became

diminished when she was very anxious. (R. 362-63.)

On November 9, 2007, Carl Hermsmeyer, Ph.D, completed a Psychiatric Review Technique and a Mental RFC Assessment. (R. 412-29.) Dr. Hermsmeyer noted that Tovar suffers from anxiety marked by "recurrent and intrusive recollections of a traumatic experience," and panic disorder without agoraphobia. (R. 417.) As for Tovar's functional limitations, Dr. Hermsmeyer concluded that she has mild restrictions in activities of daily living, moderate limitations in maintaining social functioning and concentration, persistence, or pace, and no episodes of decompensation. (R. 422.) Specifically, he found that Tovar was moderately limited in her ability to understand, remember, and carry out detailed instructions, but had no other significant limitations. (R. 426-27.) Ultimately, Dr. Hermsmeyer concluded that Tovar's mental limitations do not meet or equal any mental listing and that she "retains the mental capacity to perform simple one and two-step tasks at a consistent pace." (R. 424.)

### C. Claimant's Testimony

Tovar appeared at the hearing before ALJ Stewart and testified as follows. At the time of the hearing, Tovar was 38 years old, 5'9.5" tall, and weighed 180 pounds. (R. 25, 34.) Tovar is divorced, has no children, and lives with her boyfriend. (R. 26, 49.) Tovar received her GED, but completed only one month of college. (R. 26, 359.)

From 1994 to 2002, Tovar worked as a waitress and bartender at a hotel. (R. 26.) She also worked as a waitress at a restaurant from 2002 to 2005. (R. 26, 144.) As a waitress and bartender, Tovar frequently lifted fifty pounds. (R. 27.) From 2002 until 2004, Tovar also worked as a caregiver for an elderly woman. (R. 29, 144.) At this job, she helped the elderly woman perform every day tasks, such as getting in and out

of bed, showering, and going to doctor's appointments. (R. 29.)

Tovar worked as a dog groomer for approximately six months in 2006. (R. 28, 144.) Her duties included lifting dogs into bathtubs, washing dogs, and cutting hair. (R. 29.) Tovar subsequently worked as a veterinary technician at an animal hospital. (R. 27.) In that position, she lifted dogs onto tables, sterilized medical supplies, and cleaned kennels. (*Id.*) Tovar had to quit her job as a veterinary technician in early January 2007 due to her back pain. (R. 28.)

When asked about her pain, Tovar explained that she suffers from pain in her lower back and cramping in her right thigh. (R. 35.) She also experiences numbness in her genital area and her foot often falls asleep. (*Id.*) Tovar testified that she is able to walk for approximately thirty minutes before her leg goes numb. (R. 36-37.) After thirty minutes, she needs to lay down for an hour before getting back up. (R. 37.) Tovar testified that she can only stand in one place for ten minutes before her back pain sets in. (R. 38.) She claimed that she experiences back pain when lifting as few as ten pounds. (R. 40.) Tovar can drive, but does not drive farther than ten miles for fear that her foot will fall asleep. (R. 42.)

Tovar further testified that she suffers from migraines about four times a month. (R. 40.) She previously suffered from a constant daily headache, but began to take Xanax to relieve the pain. (*Id.*) Xanax also helps with her panic attacks, which occur approximately two times a week. (R. 45.) Tovar also takes Celexa for depression. (R. 41.) At the time of the hearing, Tovar was not taking any prescription medication for her pain, and explained that pain killers cause her constipation. (R. 43.)

On a typical day, Tovar watches television, naps, uses the computer, and

prepares dinner for her boyfriend. (R. 46.) Apart from her monthly appointments with Dr. Hussain, Tovar does not leave the house alone. (R. 47.) She does leave the house with her boyfriend and/or his sister about twice a week to go shopping or to the library. (*Id.*) About four days a week, she suffers from back pain, a headache, or her depressive feelings. (R. 49-50.)

### D. Vocational Expert's Testimony

Vocational Expert Cheryl Hoiseth ("the VE" or "VE Hoiseth") also testified at the hearing. She first described Tovar's past positions as defined by the Dictionary of Occupational Titles ("DOT"). (R. 31.) The VE explained that Tovar's waitress and bartender jobs are considered two separate positions by the DOT, cocktail waitress and bartender, respectively. (R. 31.) Both are classified as semiskilled and light. (*Id.*) VE Hoiseth noted that although Tovar testified she performed these positions at the medium exertional level, Hoiseth agreed with the DOT classification. (R. 31-32.)

Next, VE Hoiseth classified Tovar's work as a veterinary technician as a skilled job, but opined that because Tovar only worked in this position for six months, it should not count as part of her resume. (R. 31-32.) The VE defined Tovar's position as a dog groomer as semiskilled and medium. (R. 32.) Finally, the VE classified Tovar's caregiver position as a "home attendant," which the DOT places in the semiskilled, medium exertion category. (*Id.*) However, the VE had no difficulty believing that Tovar performed this position at the heavy exertional level. (*Id.*) According to the VE, Tovar has no skills transferrable to sedentary work. (*Id.*)

The ALJ then asked the VE to consider a younger hypothetical individual, with a high school education, and the same past relevant work experience as the claimant.

(R. 51.)  Without inserting any additional hypothetical limitations, the ALJ then asked the VE for "examples" of light, unskilled positions in the region.  (R. 52.)  The VE listed office helper (8,400) and information clerk (4,000).  (*Id.*)  When asked for sedentary, unskilled jobs, the VE described a "different kind of information clerk" (2,900), an order clerk (900), and general office clerk (3600).  (*Id.*)

Next, the ALJ asked whether missing work an average of more than two times a month, due to pain, depression, or fatigue, would be acceptable in these positions.  (R. 52-53.)  The VE responded that it would not be acceptable for an employee to be absent more than a day-and-a-half a month.  (R. 53.)  Furthermore, the employee must remain on task at least 80 percent of the time.  (*Id.*)

## II.  LEGAL ANALYSIS

### A.  Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (*quoting Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001)).  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"While the ALJ is not required to address every piece of evidence," he must "build an accurate and logical bridge from the evidence to his conclusion."  *Clifford*, 227

F.3d at 872. The ALJ must sufficiently articulate his assessment of the evidence to assure the reviewing court that he "considered the important evidence" and to enable the court to "trace the path" of his reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

### B. Analysis under the Social Security Act

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled if he or she is unable "to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To determine whether an individual is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; *Scheck*, 357 F.3d at 699-700 (7th Cir. 2004). The claimant has the burden of establishing a disability at steps one through four. *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At step five, the burden then shifts to the Commissioner. *Id.*

Here, ALJ Stewart applied the five-step analysis in reaching his decision to deny Tovar's request for benefits. At step one, the ALJ found that Tovar "has not engaged in

any substantial gainful activity since January 5, 2007, the alleged onset date." (R. 15.) At step two, ALJ Stewart determined that Tovar has the "following severe impairments: history of disc herniation with residual effects of laminectomy, depression, and anxiety." (R. 15-16.) At step three, the ALJ found that Tovar "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 16-18.)

Next, the ALJ examined Tovar's RFC. (R. 18-19.) The ALJ concluded that Tovar has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) "due to her spinal impairment which causes low back pain and intermittent numbness in her legs and feet." (R. 18.) He further noted that Tovar could not stand or walk for six of eight hours and is limited to lifting ten pounds at a time. (*Id.*) Additionally, the ALJ stated that Tovar is "able to perform the basic demands of unskilled work activity which includes the ability to understand, remember, and carry out simple instructions; respond appropriately to supervisors and coworkers and tolerate routine work stress." (*Id.*) Because the exertional demands of Tovar's past relevant positions as a dog groomer, care giver, and veterinary technician were greater than sedentary, the ALJ concluded at step four that Tovar could not perform her past relevant work. (R. 20.)

Lastly, the ALJ found that Tovar is capable of performing jobs that exist in significant numbers in the national economy, including information clerk, order clerk, and general office clerk. (R. 20-21.) As a result, the ALJ determined that "claimant has not been under a disability, as defined in the Social Security Act, from January 5, 2007, through the date of this decision." (R. 21.)

On appeal, claimant argues that (1) the ALJ's determination at step two was erroneous; (2) the ALJ failed to properly consider Listings 1.03, 12.04, and 12.06 at step three; (3) the ALJ's RFC assessment was erroneous; (4) the ALJ's credibility assessment was patently wrong; and (5) the ALJ's step five determination was erroneous.

### III. DISCUSSION

#### A. The ALJ's Step Two Analysis Was Not Erroneous.

Tovar first contends that the ALJ erred in his determination regarding the severe impairments from which she suffers. Again, at step two, the ALJ acknowledged Tovar's history of disc herniation with the residual effects of laminectomy, depression, and anxiety as her severe impairments. According to Tovar, the ALJ failed to properly consider the combined effects of all of her impairments, both severe and non-severe, on her ability to work, thereby materially affecting his analysis at the later steps. *See* 20 C.F.R. § 404.1523. Tovar also contends that the ALJ failed to properly consider her urinary incontinence at step two. On both points, we disagree.

For a medically determinable impairment or a combination of impairments to be deemed "severe" at step two within the meaning of the regulations, it must significantly limit an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). However, as the Seventh Circuit has recently explained, "deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (*citing Castile v. Astrue*, 617 F.3d 923, 927–28 (7th Cir. 2010)).

14

Where, as here, ALJ Stewart found certain impairments severe and moved to the next sequential step in the analysis, we find no reversible error. *See Willis v. Astrue*, No. 10–207, 2011 WL 2607042, at *9 (S.D.Ill. July 1, 2011) ("[T]he determination of whether a particular impairment is severe or not is of no consequence to the outcome of the case where, as here, the ALJ recognized other severe impairments and so proceeded with the full evaluation process."); *see also Eskew v. Astrue,* 462 Fed. Appx. 613, 615 (7th Cir. Dec. 2, 2011) (rejecting argument that the ALJ erred by failing to consider non-severe impairments in combination at step two after finding the claimant had severe impairments).

As for Tovar's bladder incontinence, we recognize that the record does indeed include notations regarding this problem. For example, on February 20, 2007, Dr. Barua noted that Tovar had "some urinary incontinence." (R. 312.) Additionally, it was noted on December 11, 2007, during the internal medical consultative examination, that Tovar suffered from "stress incontinence of urine with coughing or sneezing." (R. 408.) Nonetheless, the mere existence of diagnoses and symptoms does not mean that the ALJ is required to find the claimant suffers from disabling impairments. *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007). Here, Tovar has not offered any objective medical evidence or explanation as to the severity of her incontinence or how it limits her ability to work. For these reasons, we find no error in the ALJ's step two analysis.

**B.  The ALJ Did Not Err in His Step Three Listing Analysis.**

Next, Tovar argues that the ALJ erred in finding that her lower back impairments and her mental impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1. According to Tovar, the ALJ failed to consider

15

Listing 1.03 and inadequately addressed Listings 12.04 and 12.06. Again, we disagree.

In order to receive an award of disability insurance benefits and supplemental security income at step three, the claimant, who bears the burden at this step, must satisfy all of the criteria in the specific listing at issue. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). An ALJ's failure to mention specific listings, "if combined with a 'perfunctory analysis,' may require a remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (*quoting Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "On the other hand, an ALJ's failure to explicitly reference a relevant listing does not alone require reversal." *Knox v. Astrue*, 572 F. Supp. 2d 926, (N.D. Ill. 2008) (*citing Rice v. Barnhart*, 384 F.3d at 369-370).

Here, we disagree that the ALJ's failure to address Listing 1.03 warrants remand. That Listing, which falls in the musculoskeletal category of impairments, refers to "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Part 404, Subpart P, App. 1, §1.03. The inability to ambulate effectively is defined as "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* at §1.00B2b. "Ineffective ambulation is defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.*

Although Tovar's laminectomy and discectomy may indeed satisfy the reconstructive surgery element of Listing 1.03, she has failed to submit objective medical evidence to satisfy the ineffective ambulation element. Contrary to claimant's assertion, the minimal notations in the record regarding numbness and decreased range of motion are alone insufficient to support a finding that she cannot ambulate effectively. Additionally, by Tovar's own testimony, she does not use an assistive device and she can walk for thirty minutes without stopping. As a result, we find no error in the ALJ's failure to address Listing 1.03.

We also find no merit to the claimant's arguments regarding the ALJ's analysis of Listings 12.04 and Listings 12.06, which relate to affective disorders and anxiety-related disorders, respectively. As an initial matter, we find no error in the ALJ's decision not to elaborate on the "A" criteria of the listings when he determined that those criteria had been satisfied. Further, contrary to the claimant's assertion, the ALJ did apply the "special technique" required by the regulations, *see* 20 C.F.R. § 404.1520a(a), when he rated the claimant's degree of functioning in the areas of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. (R. 17.) That the claimant disagrees with those ratings does not require reversal. Lastly, as the Commissioner points out, the ALJ did expressly consider the report of the consultative examiner Dr. Sherman. As such, we find no reversible error in the ALJ's step three analysis.

### C. The ALJ's Credibility Determination Is Glaringly Deficient and Warrants Remand.

Tovar also contends that the ALJ's credibility determination was patently wrong.

In determining whether a credibility determination is "patently wrong," the court assesses whether the ALJ's determination was reasoned and supported. *Norris v. Astrue*, 776 F. Supp. 2d 616, 632 (N.D. Ill. 2011). The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p, 1996 WL 374186, at *2. It is well settled that an ALJ "may not reject a claimant's subjective complaints of pain solely because they are not supported by medical testimony." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Here, ALJ Stewart's credibility determination consists of the following boilerplate statement:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. 19.) The Seventh Circuit has recently described this template as "unhelpful" and "meaningless," because it "backwardly implies that the ability to do work is determined first and is then used to determine the claimant's credibility." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (*quoting Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). While the use of this boilerplate language by itself does not render a credibility determination invalid, failing to accompany that language with an "explanation and evidence from the record does." *Mueller v. Astrue*, --- F.Supp.2d ----, 2012 WL

18

1802075, at *15 (N.D. Ill. May 17, 2012).

Unfortunately, in our case, ALJ Stewart provided nothing more than the boilerplate template. While he recited some of Tovar's testimony and medical records, he failed to provide a sufficient explanation for his determination that Tovar lacked credibility. *See Smith v. Astrue,* 467 Fed. Appx. 507, 511 (7th Cir. Mar. 12, 2012) (holding credibility assessment deficient where ALJ's opinion "tick[ed] off certain medical evidence," but did "not specify how the evidence undermines [the claimant's] credibility or which statements the ALJ found not credible."). In fact, apart from two brief statements that Tovar's testimony regarding the frequency of her headaches and panic attacks conflicted with the medical records, ALJ Stewart gave absolutely no explanation regarding his credibility determination. And, again, an "ALJ may not discredit claimant's subjective complaints of pain and limitations solely because of a lack of corroborating objective medical evidence." *Doering v. Astrue,* No. 10 C 5730, 2012 WL 1418851, at *3 (N.D. Ill. Apr. 24, 2012) (*citing Bjornson*, 671 F.3d at 648). ALJ Stewart's failure to build a logical bridge between the evidence and his credibility determination requires remand for further proceedings.

In light of our decision to remand and because the ALJ's credibility determination relates to the RFC determination, we need not address Tovar's remaining arguments. However, Tovar's request for an award of benefits is denied. We also deny Tovar's request that this case be assigned to a different ALJ on remand, as she has not shown that ALJ Stewart "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007).

### III.    CONCLUSION

For the foregoing reasons, claimant's motion for summary judgment [18] is granted in part and denied in part, and this case is remanded to the Social Security Administration for proceedings consistent with this Opinion. It is so ordered.

ENTERED:

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:** **August 27, 2012**